**STATE OF WEST VIRGINIA**

**FILED**
**June 1, 2023**
**released at 3:00 p.m.**
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**Everett Frazier, Commissioner,**
**West Virginia Division of Motor Vehicles,**
**Respondent Below, Petitioner**

**vs.) No. 21-0568** (Berkeley County 19-P-353)

**Cheryl L. Yoder,**
**Petitioner Below, Respondent**

**and**

**Everett Frazier, Commissioner,**
**West Virginia Division of Motor Vehicles,**
**Respondent Below, Petitioner**

**vs.) No. 22-0112** (Berkeley County 21-AA-5)

**Cheryl L. Yoder,**
**Petitioner Below, Respondent**


**MEMORANDUM DECISION**


In this consolidated appeal, Petitioner Everett Frazier, Commissioner of the West Virginia Division of Motor Vehicles ("DMV"), appeals two separate orders of the Circuit Court of Berkeley County.[1] First, the DMV appeals the circuit court's June 20, 2021 order directing it to pay undetermined costs and remanding the matter to the Office of Administrative Hearings ("OAH")[2] for an additional evidentiary hearing regarding the results of an eleven-panel drug screen. Second, it appeals the circuit court's January 26, 2022 order concluding that Respondent Cheryl Yoder requested a blood test that she did not receive and reversing the OAH's final order that had revoked Ms. Yoder's personal and commercial driver's licenses. For the reasons below, the June 20, 2021

---

[1] Petitioner appears by counsel Attorney General Patrick Morrisey and Assistant Attorney General Elaine L. Skorich. Respondent appears by counsel B. Craig Manford.

[2] The OAH ceased to exist on July 1, 2021. *See Frazier v. Null*, 246 W. Va. 450, 452 n.1, 874 S.E.2d 252, 254, n.1 (2022).

1

order of the circuit court is affirmed, in part, and vacated, in part. The January 26, 2022 order of the circuit court is affirmed.[3]

## I.     Factual and Procedural History

On July 3, 2017, Martinsburg City Police Officer C.R. Williamson followed Ms. Yoder's vehicle after observing it traveling well below the posted speed limit and weaving. Officer Williamson continued to monitor the vehicle as it made a wide, slow turn, suddenly pulled off the road into a parking spot, and then immediately pulled back onto the road behind him after he drove past. Because of these observations, Officer Williamson pulled into another parking spot and waited for Ms. Yoder's vehicle. He saw the vehicle come within inches of his front bumper. Ms. Yoder attempted to park but had difficulty, ending up crossways in the middle of the road. After failing to park properly, Ms. Yoder drove away. Officer Williamson then initiated a traffic stop.

According to the DUI Information Sheet and Officer Williamson's written statement, Ms. Yoder "immediately stumbled out of the vehicle and started walking back to [his] patrol car." He directed her several times to return to her vehicle. Once she complied, Officer Williamson tried to obtain her information. He noticed that Ms. Yoder's "speech was slightly slurred[,] and her eyes were red." Officer Williamson indicated that he "continued to speak with Ms. Yoder until [he] was sure she was under the influence of prescription drugs." He administered three standardized field sobriety tests, which Ms. Yoder failed,[4] but he did not give the additional tests designed to detect impairment from drugs and controlled substances. Officer Williamson arrested Ms. Yoder for driving under the influence of prescription drugs and transported her to the police station. There, he observed Ms. Yoder for twenty minutes and then administered the secondary chemical test where she blew a .000 on the Intoximeter. Ms. Yoder was not given a blood test at the time of her arrest.

Following her arrest, the DMV sent Ms. Yoder two orders dated July 28, 2017, revoking her personal driver's license, and disqualifying her from holding a valid commercial driver's license ("CDL").[5] She requested a hearing on the revocation and disqualification. In October 2018, the OAH conducted a hearing. The DMV subpoenaed both Officer Williamson and the processing officer to appear at the hearing, but neither attended.[6] The DMV did not call any other witness, but the agency's documents were admitted into evidence. The DUI Information Sheet completed by Officer Williamson indicated the following: (1) Ms. Yoder was operating a vehicle under the

---

[3] This consolidated case meets the "limited circumstances" requirement of Rule 21(d) of the West Virginia Rules of Appellate Procedure and is appropriate for disposition by memorandum decision.

[4] Officer Williamson administered the horizontal gaze nystagmus, one-leg stand, and walk-and-turn tests.

[5] Ms. Yoder is a CDL license holder and drives trucks as part of her employment.

[6] The DMV moved to continue the hearing because of the failure of both officers to appear; however, Ms. Yoder objected. The OAH denied the motion.

influence of an "impairing substance"; (2) the vehicle weaved, almost struck an object or vehicle, turned with wide radius, varied in speed, stopped in lane for no reason, and committed an illegal/improper turn; (3) Ms. Yoder was observed as having slurred speech, disorientation, dry mouth, confusion, raspy voice, and bloodshot/watery eyes; (4) Ms. Yoder appeared normal when exiting the vehicle, walking to roadside, and standing; and (5) Ms. Yoder did not make any admissions or statements. Officer Williamson did not complete the Miranda Warning or Interview sections. The Blood Test section of the DUI Information Sheet showed that Ms. Yoder did not have a blood test. Officer Williamson left the remaining portion of this section, including whether Ms. Yoder requested a blood sample, blank.[7] The OAH also admitted Officer Williamson's written statement regarding the incident into evidence. This written statement was silent as to any request, either by Officer Williamson or Ms. Yoder, for a blood test. The DMV then rested.

Ms. Yoder testified on her own behalf at the hearing. Ms. Yoder stated that prior to the arrest, she had not taken any impairing substance, including alcohol or prescription medication, and explained that she possibly had slurred speech from recent dental work and that she has a lisp. Ms. Yoder stated that her erratic driving was due to her observation of the poor state of the streets, and she failed the sobriety tests because she was laughing at how long the tests were taking and because of medical issues. Twice during her testimony, Ms. Yoder claimed that she asked the investigating officer to take her to obtain a blood test, but he would not. She testified that upon her release, she obtained drug testing on her own through urinalysis at a local urgent care center. Ms. Yoder presented three negative eleven-panel urine screens into evidence before the OAH.[8] The OAH admitted the three urine screen results, the secondary chemical test results, the DUI Information Sheet, and Officer Williamson's written statement.

After weighing the evidence, the OAH entered a final order on September 6, 2019, affirming Ms. Yoder's license revocation and disqualification. The OAH found that Ms. Yoder was lawfully arrested and that there was "evidence of the use of alcohol, drugs, controlled substances[,] or any combination of the aforementioned based on . . . [Ms. Yoder's] driving pattern, her physical appearance[,] and her performance on the standard field sobriety tests." The OAH further noted that Ms. Yoder's results on the secondary chemical test administered showed that her blood alcohol concentration level was zero. While the OAH admitted the urine screen results, it concluded that

_____

[7] Specifically, the DUI Information Sheet set forth the following questions: (1) was request for a blood sample directed by the arresting officer; (2) was a search warrant obtained; (3) did suspect request blood sample; and (4) was blood sample taken for medical treatment. Each of these questions had a yes and a no box for the arresting officer to check. Officer Williamson failed to check any of the boxes for these questions.

[8] On July 3, 2017, upon Ms. Yoder's release from jail, she obtained a negative drug screen. Ms. Yoder later obtained two additional negative drug screens on July 14, 2017, and August 23, 2017. Neither the OAH nor DMV counsel asked any questions of Ms. Yoder or her counsel to clarify what substances were analyzed by the urine screens Ms. Yoder obtained.

no evidence was presented to explain the results to include what substances the tests were designed to discover and what substances the tests would not discover. The results indicate "normal," but no information was presented as to what that means. As such, the relevance of those documents [is] minimal, only indicating that either [Ms. Yoder] believed she was not under the influence or that [Ms. Yoder] knew the tests would not reveal the substances that she had taken.

The OAH also acknowledged that Ms. Yoder testified she asked Officer Williamson to take her to get a blood test, but that he did not comply with her request. However, the OAH found that

[n]o other evidence was presented that clearly supports this claim. She did go to Valley Health and get a [urine] test that day,[9] but this decision could have been made after her interactions with the [i]nvestigating [o]fficer when she had a chance to talk to others. No clear evidence was presented that she requested the assistance of the [i]nvestigating [o]fficer in obtaining a blood test; in any case, she was able to obtain a [urine] test that day—even though she did not present evidence explaining the results of the [urine] test.

(Footnote added). Finding Officer Williamson's written statement and the DUI Information Sheet to be more credible than Ms. Yoder's testimony, the OAH determined that there was sufficient evidence to prove by a preponderance of the evidence that Ms. Yoder "drove a motor vehicle in this State while under the influence of alcohol, drugs, a controlled substance, or any combination of the aforementioned on July 3, 2018." The OAH affirmed the DMV's order revoking Ms. Yoder's personal driving license and the companion order disqualifying her from holding a valid commercial license. Ms. Yoder appealed to the circuit court.[10]

Upon appeal, the circuit court reversed the OAH's final order, in part, based upon the OAH's reliance on the DMV's file when the investigating and processing officers did not testify at the hearing. *See Frazier v. Yoder*, No. 20-0336, 2021 WL 653244, at *1 (W. Va. Feb. 19, 2021) (memorandum decision). The DMV then appealed to this Court challenging the circuit court's order as to several issues. *See generally id*. We reversed and remanded the matter to the circuit court, finding that the ruling regarding the OAH's reliance on the DMV's file ran afoul of our conclusion in *Frazier v. Fouch*, 244 W. Va. 347, 853 S.E.2d 587 (2020), and that the circuit court

---

[9] The order indicates that Ms. Yoder received a blood test rather than a urine test. However, there is no evidence in the record indicating that she received a blood test. There appears to be no dispute that Ms. Yoder did not receive a blood test, and the OAH's reference to a blood test, rather than a urine test, was an error.

[10] The record on appeal reflects, and the DMV does not dispute, that the city attorney dismissed all criminal charges against Ms. Yoder with the consent of Officer Williamson prior to the OAH's revocation and disqualification of Ms. Yoder's licenses.

erred by ruling that the DMV was required to secure an officer's attendance at the OAH hearing.[11] *Yoder*, No. 20-0336, 2021 WL 6532449, at *3.

On remand, the circuit court entered a new order on June 20, 2021. The circuit court noted that upon review of an agency's administrative order pursuant to West Virginia Code § 29A-5-4, it had the authority to affirm, reverse, vacate, or modify the OAH order. It also concluded that it could remand the case for further proceedings. The June 20, 2021 order included the following relevant findings and conclusions:

36. The [c]ourt finds that [Officer] Williams did have reasonable articulable suspicion or probable cause to effect a traffic stop of [Ms. Yoder] from his descriptions of her driving and her own admissions regarding the same.

. . . .

39. . . . Because the [c]ourt reaches the conclusion that this matter must be remanded for a new evidentiary hearing on another basis, to properly consider the significance of the July 3, 2017 negative [eleven-]panel urine drug screen, the [c]ourt makes no ruling on the issue of whether the determination of the Hearing Examiner that [Ms. Yoder] failed to prove that she requested a blood draw of the arresting officer should be revisited.

40. The [c]ourt finds that the [h]earing [e]xaminer's decision to afford the admitted drug screen evidence . . . no or only minimal weight to be clearly wrong in view of the reliable, probative and substantial evidence on the whole record. The [c]ourt finds said decision to also be arbitrary and capricious and an unwarranted exercise of discretion.

. . . .

50. In light, however of our Supreme Court of Appeal[s'] admonitions that the reviewing [c]ourt in an A[dministrative] P[rocedures] A[ct] case[] appealing driver's license revocations should not reweigh the evidence, reassess the credibility of witnesses, substitute its judgment for that of the [h]earing [e]xaminer . . . or indicate a preference for live testimony over documentary evidence, . . . the [c]ourt believes that this matter should be remanded to the OAH for a new evidentiary hearing to permit the record to be developed as to what substances the Valley Health Urgent Care [Eleven-]Panel Non-[DOT] Drug Screen tested for, what a negative screen would thus mean in the context of this case and in light of all the other evidence, and to provide the [DMV] the opportunity to meet that evidence.

---

[11] Because this Court determined that the circuit court's ruling ran afoul of *Fouch* and required remand, we declined to address any other issue raised, including the sufficiency of the evidence. *See Frazier v. Yoder*, No. 20-0336, 2021 WL 653244, at *3 (W. Va. Feb. 19, 2021) (memorandum decision).

The court further ordered in its June 20, 2021 order "that the [DMV] shall be taxed with the costs of these proceedings." The DMV appealed.

Meanwhile, the OAH immediately conducted a second evidentiary hearing on June 28, 2021, on the limited issue of the eleven-panel drug screen. At the second hearing, Ms. Yoder presented two witnesses. First, Kristina Malloy who was employed by Valley Health Urgent Care in July 2017, testified that she had administered the eleven-panel non-DOT rapid drug screen to Ms. Yoder and described the normal procedure of administering that test. Next, Kelly Peters, a registered nurse, nurse practitioner, and a certified forensic nurse examiner, testified an eleven-panel drug screen typically tests for: marijuana, cocaine, basic opioids, amphetamine, PCP, benzodiazepines, barbiturates, methadone, propoxyphene, methaqualone, and oxycontin. Ms. Peters stated that, in her opinion, if any of those drugs had been consumed within seventy-two to forty-eight hours prior to the test, the results could have been positive. Per her testimony, there are other drugs that could cause impairment that would not show up in an eleven-panel drug screen, but these eleven are the most common drugs abused.

Upon conclusion of this hearing, the OAH issued an order[12] affirming the original July 28, 2017 orders of revocation and disqualification, finding as follows:

> [c]onsidering that the evidence presented in the second hearing indicated that the [eleven-]panel drug screen test does not test for all drugs, and considering the evidence presented at the first hearing that indicated that [Ms. Yoder] displayed so many clues indicating impairment, the evidence indicates that, more likely than not, [Ms. Yoder] was driving while under the influence of a controlled substances [sic] or drugs that the [eleven-]panel drug screen test does not test for.

Ms. Yoder then filed her second petition for judicial review with the circuit court on July 20, 2021.

On January 26, 2022, the circuit court again found for Ms. Yoder, reversing the June 29, 2021 OAH order.[13] Specifically, the circuit court found that "there is persuasive evidence that [Ms. Yoder] did in fact request the arresting officer to take her for a blood draw either during or at the conclusion of the traffic stop[,]" and that this testimony "was not rebutted by the documentary evidence of the record." The circuit court found this error alone to be reversible error. The DMV appealed and this Court consolidated with its appeal of the June 20, 2021 order referenced above.

## II.      Standard of Review

We have held that

---

[12] The OAH entered this order on June 29, 2021, prior to its dissolution on July 1, 2021.

[13] The circuit court also took issue with the OAH's decision to render a final decision on the merits as opposed to simply supplying it with the requested testimony and evidence regarding the eleven-panel drug screen.

[o]n appeal of an administrative order from a circuit court, this Court is bound by the statutory standards contained in W. Va. Code § 29A-5-4[(g)] and reviews questions of law presented *de novo*; findings of fact by the administrative officer are accorded deference unless the reviewing court believes the findings to be clearly wrong.

Syl. pt. 1, *Muscatell v. Cline*, 196 W. Va. 588, 474 S.E.2d 518 (1996). We have further held that "[i]n cases [such as this one,] where the circuit court has [reversed] the result before the administrative agency, this Court reviews the final order of the circuit court and the ultimate disposition by it of an administrative law case under an abuse of discretion standard and reviews questions of law *de novo*." Syl. pt. 2, *Muscatell*, 196 W. Va. 588, 474 S.E.2d 518.

## III. Discussion

In Appeal No. 21-0568, the DMV asserts that the circuit court erred in (1) assessing the DMV with costs and (2) finding that the evidence in this matter was insufficient to uphold the revocation of Ms. Yoder's license, having successfully rebutted the DMV's evidence. In Appeal No. 22-0112, the DMV argues that the circuit court erred in finding that Ms. Yoder requested a blood test and in reversing the OAH's final order on this basis. We address these assignments of error in turn.

### A. Appeal No. 21-0568

In its first assignment of error, the DMV contends that the circuit court erred in assessing general costs "of these proceedings" to the DMV. Ms. Yoder concedes that the circuit court erred in assessing costs against the DMV. Generally, "[t]his Court is not obligated to accept the [respondent's] confession of error . . . . We will do so when, after a proper analysis, we believe error occurred." Syl. pt. 8, *State v. Julius*, in part, 185 W. Va. 422, 408 S.E.2d 1 (1991). *See also In re M.L.*, No. 14-0501, 2015 WL 249192, at *1 n.1 (W. Va. Jan. 12, 2015) (memorandum decision) (same); Syl. pt. 4, *Petition of Hull*, 159 W. Va. 363, 222 S.E.2d 813 (1976) ("In a case where the appellee confesses error and indicates that the judgment should be reversed, this Court, upon ascertaining that the errors confessed are supported by law and constitute cause for the reversal of the judgment and the entry of judgment, will reverse the judgment and enter judgment in this Court."). In other words, "confessions of error do not automatically entitle a party to a reversal[;] reversal is required when it can be ascertained that the errors confessed are supported by law." *State v. Berrill*, 196 W. Va. 578, 587, 474 S.E.2d 508, 517 (1996) (internal quotations and citations omitted).

We have held that "[u]nless expressly provided by statute, costs will not be assessed against the State in a suit to which the State is a party[.]" Syl. pt. 12, in part, *State v. Blevins*, 131 W. Va. 350, 48 S.E.2d 174 (1948). *See also* Syl. pt. 2, *Sally-Mike Properties v. Yokum*, 179 W. Va. 48, 365 S.E.2d 246 (1986) ("As a general rule each litigant bears his or her own attorney's fees absent a contrary rule of court or express statutory or contractual authority for reimbursement."); *Nelson v. W. Va. Pub. Empl. Ins. Bd.*, 171 W. Va. 445, 450, 300 S.E.2d 86, 91 (1982) ("As a general rule awards of costs and attorney fees are not recoverable in the absence of a provision for their allowance in a statute or court rule." (citations omitted)); Syl. pt. 2, *Gardner v. Bailey*, 128 W. Va.

331, 36 S.E.2d 215 (1945) ("An award of costs against the State will only be made where there is express statutory authority therefor."). Here, the DMV appealed the OAH's final order to the circuit court pursuant to the West Virginia State Administrative Procedures Act ("APA"), West Virginia Code §§ 29A-1-1, *et seq*. The APA does not contain any provision for assessing costs against the DMV under these circumstances in this type of proceeding. Furthermore, the circuit court acted sua sponte in assessing these unexplained and vague costs. Nothing in the circuit court's order or in the record on appeal demonstrates what costs were assessed to the DMV or the basis for such assessment. The circuit court's order is devoid of any discussion of or citation to any statute or court rule it relied upon, nor is there any apparent conduct that could arguably warrant assessing costs. Consequently, the circuit court erred in assessing costs against the DMV, and we vacate the portion of the circuit court's June 20, 2021 order that required the DMV to pay such costs.

Next, the DMV asserts that the circuit court erred in finding that the evidence in this matter was insufficient to uphold Ms. Yoder's license revocation and disqualification and that Ms. Yoder rebutted the DMV's evidence. Essentially, the DMV argues that in the June 20, 2021 order, the circuit court erred because it made several improper credibility determinations. While the circuit court made several findings that the OAH clearly erred, it ultimately concluded it could not make credibility determinations and instead remanded the matter back to the OAH for further consideration of the eleven-panel drug screen testimony. Additionally, and more importantly, as discussed below, the OAH clearly erred as to its finding that Ms. Yoder did not request a blood test.[14] Therefore, we affirm the remainder of the circuit court's June 20, 2021 order remanding the case to the OAH for further evidentiary proceedings.

### B.    *Appeal No. 22-0112*

The sole assignment of error in the DMV's appeal of the circuit court's second order is that the circuit court erred in finding that Ms. Yoder requested a blood test and in reversing the OAH's final order finding to the contrary. The DMV argues that the circuit court erroneously substituted its own judgment and credibility determinations over that of the OAH in finding that Ms. Yoder requested a blood test. Ms. Yoder contends that the circuit court did not err because she testified on at least two occasions during the hearing before the OAH that she requested a blood test and that the DMV did not present any evidence to rebut that position. We agree with Ms. Yoder.

We have consistently held that "findings of fact by the administrative officer are accorded deference unless the reviewing court believes the findings to be clearly wrong." Syl. pt. 1, in part, *Muscatell*, 196 W. Va. 588, 474 S.E.2d 518. "We must uphold any of the [Administrative Law Judge's] factual findings that are supported by substantial evidence, and we owe substantial deference to inferences drawn from these facts. Further, the [Administrative Law Judge's] credibility determinations are binding *unless patently without basis in the record*." *Martin v. Randolph Cnty. Bd. of Educ.*, 195 W. Va. 297, 304, 465 S.E.2d 399, 406 (1995) (emphasis added). This Court must determine whether the OAH clearly erred in finding that Ms. Yoder did not request a blood test.

---

[14] As discussed below, the OAH's erroneous determination that Ms. Yoder did not request a blood test is dispositive under the limited facts of this matter.

Applying these standards to the present case, we agree that the OAH clearly erred. In the proceedings before the OAH, Ms. Yoder testified that she requested a blood test during the arrest and that Officer Williamson did not take Ms. Yoder to obtain one. She also stated that because no blood test was given, as soon as she was released from jail, she obtained an eleven-panel urinalysis drug test from a local urgent care center. Officer Williamson did not testify during the proceeding below; however, the DMV submitted into evidence the DUI Information Sheet, which provides the investigating officer the opportunity to properly document whether a blood test was completed, whether it was requested, the time it was requested, who requested it, and whether one was refused by the driver. The DUI Information Sheet explicitly indicated that no blood test was given. In addition, there were two boxes, a yes and a no, to indicate whether Ms. Yoder requested the test. Neither of these boxes was checked. Thus, under the facts and evidence presented, there was no basis in the record for the OAH to conclude that Ms. Yoder did not request a blood test. The OAH's finding that Ms. Yoder did not request a blood test is clearly wrong in view of the reliable, probative, and substantial evidence on the whole record.

Even though we find that the OAH clearly erred, our analysis does not end here. Under West Virginia Code § 17C-5-9

> [a]ny person lawfully arrested for driving a motor vehicle in this state while under the influence of alcohol, controlled substances or drugs shall have the right to demand that a sample or specimen of his or her blood or breath to determine the alcohol concentration of his or her blood be taken within two hours from and after the time of arrest and a sample or specimen of his or her blood or breath to determine the controlled substance or drug content of his or her blood, be taken within four hours from and after the time of arrest, and that a chemical test thereof be made. The analysis disclosed by such chemical test shall be made available to such arrested person forthwith upon demand.

Recently, in *Frazier v. Talbert*, this Court set forth three factors the fact-finder must consider when determining the consequences of when a driver requests a blood test, but it is not given. 245 W. Va. 293, 858 S.E.2d 918 (2021). Specifically, we held that

> [i]n a proceeding involving the revocation of a driver's license for driving under the influence of alcohol, controlled substances, or drugs *where a driver demands a blood test* pursuant to West Virginia Code § 17C-5-9 [2013], *but the test is never given*, a chemical analysis of the blood that is withdrawn is never completed, or the blood test results are lost, the trier of fact must consider (1) the degree of negligence or bad faith involved in the violation of the statute; (2) the importance of the blood test evidence considering the probative value and reliability of secondary or substitute evidence that remains available; and (3) the sufficiency of the other evidence produced at the proceeding to sustain the revocation. *The trier of fact must consider these factors in determining what consequences should flow from the absence of the blood test evidence under the particular facts of the case.*

Syl. pt. 6, *id.* (emphasis added).

9

Here, while we agree with the circuit court that the OAH's finding that Ms. Yoder did not request a blood test is clearly wrong in view of the reliable, probative, and substantial evidence on the whole record, the OAH is now dissolved and cannot undertake the required *Talbert* analysis to determine what the consequence is from the lack of the blood test results.[15] *See Frazier v. Null*, 246 W. Va. 450, 452 n.1, 874 S.E.2d 252, 254 n.1 (2022) (noting that as of July 1, 2021, the OAH no longer exists). The Legislature has previously approved the dismissal of unresolved administrative DUI revocations that were pending at the time of the OAH's dissolution. *See* W. Va. Code § 17C-5C-1a(c)(1) ("If any appeal of a revocation or suspension order, described in § 17C-5C-3(3) of this code, is pending before the office on or after July 1, 2021, the underlying revocation or suspension order shall be dismissed.").[16] There is no fact-finder to whom this matter can be remanded to determine the consequences of the failure to obtain a blood test. Consequently, the circuit court's reinstatement of Ms. Yoder's driving licenses is final.

---

[15] Recently, this Court has conducted the *Talbert* analysis. *See, e.g.*, *Frazier v. Howie*, No. 20-0364, 2022 WL 4355565, at *2 (W. Va. Sept. 20, 2022) (memorandum decision) ("[I]n this case, where Mr. Howie admitted to having ingested controlled substances, where the officer observed Mr. Howie driving in the wrong direction, and where the officer further noted other physical indicators of intoxication, we find that the *Talbert* considerations weigh in favor of the commissioner's revocation order); *Frazier v. Raschella*, No. 20-0103, 2022 WL 4355558, at *2 (W. Va. Sept. 20, 2022) (memorandum decision) ("The evidence presented to the OAH overwhelmingly established Mr. Raschella's intoxication."). However, in those instances the evidence of DUI was otherwise overwhelming. *But see Frazier v. Simpkins*, No. 20-0313, 2022 WL 4355562, at *2 (W. Va. Sept. 20, 2022) (memorandum decision) ("Under the unique circumstances before us, where the OAH findings indicate a teetering balance of evidence, the *Talbert* concerns suggest that Mr. Simpkins required the results of the blood test that he requested and was prejudiced by its absence."). Overwhelming evidence is simply not present in this case. Other than the observations of Officer Williamson noted in the DUI Information Sheet and his written statement, there is no other evidence to find that Ms. Yoder was impaired from the use of alcohol, drugs, and/or controlled substances. Specifically, her urinalysis drug testing results demonstrated that she was not positive for eleven of the most commonly abused substances, she had a 0% alcohol breath test, she did not admit to taking any substances or drinking any alcohol, no drug paraphernalia was found in her vehicle, and there were no alcohol or substance odors in the vehicle. During oral argument, counsel for the DMV even conceded that evaluating the weight of the evidence presented during the OAH hearing amounted to a "coin toss." *See Albrecht v. State*, 173 W. Va. 268, 273, 314 S.E.2d 859, 864 (1984) ("A preponderance of the evidence is all that is required to justify administrative revocation."). "[A] fact that can only be decided by a coin toss has not been proven by a preponderance of the evidence, and cannot be submitted to the jury." *Pineda v. Hamilton Cnty., Ohio*, 977 F.3d 483, 491 (6th Cir. 2020) (quotations and citation omitted).

[16] Two years following the dissolution of the OAH, the Legislature has recently repealed the statutory provisions establishing the OAH within the Department of Transportation and its hearing procedures. *See* 2023 W. Va. Acts, ___, eff. May 4, 2023. This repeal of the entirety of the OAH supports this Court's conclusion that there is no fact-finder to which this matter may be remanded.

**ISSUED:** June 1, 2023

**CONCURRED IN BY:**

Chief Justice Elizabeth D. Walker
Justice John A. Hutchison
Justice C. Haley Bunn

**CONCURRING AND WRITING SEPARATELY:**

Justice William R. Wooton

**CONCURRING, IN PART, DISSENTING, IN PART, AND WRITING SEPARATELY:**

Justice Tim Armstead

WOOTON, J., concurring:

I concur in the majority's conclusion that because the Office of Administrative Hearings ("OAH") no longer exists, the residual factual issues raised by the conclusion that Ms. Yoder requested a blood test require affirmance of the circuit court's reinstatement of her license. The majority has finally acknowledged that because "the OAH is now dissolved . . . [t]here is no fact-finder to whom this matter can be remanded to determine the consequences of the failure to obtain a blood test." I write separately, however, to express my disagreement with the majority's suggestion that its failure to resolve other identical cases in this fashion was proper because in those cases "evidence of DUI was otherwise overwhelming."

I reiterate my position that the "denial of a driver's statutory right to a blood test is simply irremediable . . . and commands dismissal of the action against the driver." *Frazier v. Talbert*, 245 W. Va. 293, 310, 858 S.E.2d 918, 935 (2021) (Wooton, J., dissenting). Nevertheless, the test adopted by the majority in *Talbert* is now the law of the State and requires that where a driver requests a blood test that is not provided, the "trier of fact" must consider factors to "determine[e] what consequences should flow from the absence of the blood test evidence under the particular facts of the case." *Id.*, syl. pt. 6, in part. This misguided point of law has largely been rendered meaningless, however, because it was adopted within days of the trier of fact—the

11

OAH—being disbanded. In lieu of grappling with the impracticality of effectuating this point of law, the majority has simply undertaken the analysis itself in order to sustain DUI revocations—in absence of any legal authority to do so.[1]

In a complete about-face, however, the majority now suddenly declares that the lack of a fact-finder to whom to remand this matter requires the revocation's dismissal. Citing the Legislature's "approv[al] [of] the dismissal of unresolved administrative DUI revocations that were pending at the time of the OAH's dissolution[,]" the majority now apparently has little difficulty affirming this particular reinstatement. This of course is precisely the required outcome and justification I articulated—and the majority rejected—in the other license revocations which required remand following the OAH's dissolution. *See Null*, 246 W. Va. at 462, 874 S.E.2d at 264 (Wooton, J., dissenting) ("[T]he Legislature understood the potential for certain 'unfinished business' to simply be dismissed, including revocations which may well have been meritorious, but which simply outlived the administrative process in place to handle them. A case on remand following appeal is no more or less 'unfinished' than the cases the Legislature expressly authorized to be dismissed if pending before the OAH at the time of its dissolution.").

The instant case is procedurally identical to these other cases that the majority resolved entirely differently—each involved the refusal of a driver-requested blood test and therefore required the "trier of fact" to first determine the consequences of that refusal in evaluating evidence of DUI. While I applaud its late-arriving realization that the license revocations in these cases must be dismissed, the majority's half-hearted attempt to justify its prior mishandling of these other cases must be disabused. This Court is simply not permitted to abdicate its proper role and undertake fact-finding where it believes a revocation is ultimately the correct result due to what it perceives as "overwhelming" evidence of DUI. Its casual suggestion to the contrary is not

---

[1] *See Frazier v. Null*, 246 W. Va. 450, 458, 874 S.E.2d 252, 260 (2022) (Wooton, J., dissenting) ("[B]ecause the OAH has been disbanded, the majority culls the record for evidence of DUI and adjudicates this matter itself—without statutory or other authority to do so."); *Frazier v. Raschella*, No. 20-0103, 2022 WL 4355558, at *3 (W. Va. Sept. 20, 2022) (memorandum decision) (Wooton, J., dissenting) ("Because the OAH has been dissolved, a majority of this Court has reconstituted itself as a fact-finding body to ensure that these license revocations stand."); *Frazier v. Simpkins*, No. 20-0313, 2022 WL 4355562, at *3 (W. Va. Sept. 20, 2022) (memorandum decision) (Wooton, J., concurring) ("The memorandum decision affirms petitioner's license reinstatement by incorrectly concluding that the OAH determined that petitioner requested the blood testing and performing the fact-intensive *Talbert* analysis itself, finding prejudice to petitioner from the absence of the results."); *Frazier v. Howie*, No. 20-0364, 2022 WL 4355565, at *3 (W. Va. Sept. 20, 2022) (memorandum decision) (Wooton, J., dissenting) ("The majority then itself evaluates and weighs the evidence of intoxication—which was never evaluated below by the finder of fact—to conclude that petitioner was DUI."). *See also Warner v. Frazier*, No. 20-0199, 2022 WL 4355560, at *3 (W. Va. Sept. 20, 2022) (memorandum decision) (Wooton, J., dissenting) (citing cases where majority "invoked the *Talbert* analysis under identical circumstances, and—albeit improperly—found the missing blood test results insignificant and adjudicated the issue of DUI itself. Here, it fails to dignify the missing results at all and rubber-stamps the circuit court's fact-finding and adjudication of the DUI revocation itself.").

only legally unsupportable, but cold comfort to those drivers' who were deprived similar treatment under those erroneous decisions.

With that clarification, I respectfully concur.


Armstead, Justice, concurring, in part, and dissenting, in part:

The majority in this case has correctly determined, in Appeal No. 21-0568, that the circuit court erred by assessing costs against the Division of Motor Vehicles ("DMV"). The majority has also correctly determined, in Appeal No. 22-0112, that the Office of Administrative Hearings ("OAH") erred when it found that Ms. Yoder did not request a blood test. Accordingly, I concur in the majority's decision vacating the circuit court's award of costs and affirming the circuit court's finding that Ms. Yoder requested a blood test. However, the majority proceeds to find that the circuit court's reinstatement of Ms. Yoder's driver's licenses is final because OAH is no longer available to serve as a factfinder to whom this matter may be remanded for purposes of our holding in Syllabus Point 6 of *Frazier v. Talbert*, 245 W. Va. 293, 858 S.E.2d 918 (2021). Because I believe that we have authority to conduct a *Talbert* analysis in this case and that a properly conducted *Talbert* analysis would lead us to conclude that OAH properly affirmed the revocation of Ms. Yoder's licenses, I respectfully dissent as to that portion of the majority decision that affirms the circuit court's reinstatement of Ms. Yoder's licenses.

As the majority decision notes, West Virginia Code § 17C-5-9 (eff. 2013) provides, in relevant part, that a "person lawfully arrested for driving a motor vehicle in this state while under the influence of . . . controlled substances or drugs" has a "right to demand that . . . a sample or specimen of . . . her blood" be taken "to determine the controlled substance or drug content of . . . her blood . . . and that a chemical test thereof be made." Though Ms. Yoder demanded a blood test in this case, no sample was taken and no chemical test of her blood was performed.

It is true that, prior to our decision in *Talbert*, this court had held that denial of a defendant's right to receive a requested blood test was a denial of statutory and due process rights that warranted reversing an order of revocation. *See Talbert*, 245 W. Va. at 300-03, 858 S.E.2d at 925–28 (discussing our decisions in *Reed v. Hall*, 235 W. Va. 322, 773 S.E.2d 666 (2015) and *Reed v. Divita*, No. 14-11018, 2015 WL 5514209 (W. Va. Sept. 18, 2015) (memorandum decision)). However, we repudiated this conclusion in *Talbert*, finding that it was error to reverse a revocation order "without considering the other evidence that respondent was driving while under the influence of alcohol[.]" *Talbert*, 245 W. Va. at 302, 858 S.E.2d at 927. Instead, we held that,

> where a driver demands a blood test pursuant to West Virginia Code § 17C-5-9 [2013], but the test is never given . . . , the trier of fact must consider (1) the degree of negligence or bad faith involved in the violation of the statute; (2) the importance of the blood test evidence considering the probative value and reliability of secondary or substitute evidence that remains available; and (3) the sufficiency of the other evidence produced at the proceeding to sustain the revocation.

13

*Id.* at 295, 858 S.E.2d at 920, syl. pt. 6, in part. The "trier of fact" was to "consider these factors" to determine "what consequences should flow from the absence of the blood test evidence under the particular facts of the case." *Id.*

However, as *Talbert* anticipated, OAH has since ceased to exist. *Id.* at 305 n.23, 858 S.E.2d at 930 n.23 (noting "that the OAH 'shall be terminated' on July 1, 2021, W. Va. Code § 17C-5C-1a(d) [2020]"). Nevertheless, we adopted a new syllabus point that purports to refer consideration of certain "factors" to the "trier of fact." *Talbert*, 245 W. Va. at 295, 858 S.E.2d at 920, syl. pt. 6, in part.

As our subsequent decisions plainly recognize, and as the majority concedes, "this Court has conducted the *Talbert* analysis" in three decisions issued last term: *Frazier v. Howie*, No. 20-0364, 2022 WL 4355565, *2 (W. Va. Sept. 20, 2022) (memorandum decision) (finding that "the *Talbert* considerations weigh in favor of the [DMV] commissioner's revocation order" and remanding the case for reinstatement of the revocation); *Frazier v. Raschella*, No. 20-0103, 2022 WL 4355558, at *2 (W. Va. Sept. 20, 2022) (memorandum decision) (explaining "our analysis under *Talbert*" and finding a "critical" absence of evidence showing "fault" or "bad faith" regarding the blood sample's absence); and *Frazier v. Simpkins*, No. 20-0313, 2022 WL 4355562, at *2 (W. Va. Sept. 20, 2022) (memorandum decision) (affirming the circuit court after "application of the three considerations described in *Talbert*"). Although I agree with the majority that there was strong evidence of intoxication in both *Howie* and *Rachella*, our ability to conduct a *Talbert* analysis does not hinge on the strength of such evidence. In *Simpkins*, we applied "the three considerations described in *Talbert*" despite "a teetering balance of evidence[.]" No. 20-0313, 2022 WL 4355562, at *2. Indeed, it was this "teetering balance" and our application of "*Talbert* concerns" that led us to infer that "Mr. Simpkins required the results of the blood test that he requested and was prejudiced by its absence." *Id.*

Indeed, we should remember that we drew Syllabus Point 6 of *Talbert* from Syllabus Point 2 of *State v. Osakalumi*, 194 W. Va. 758, 461 S.E.2d 504 (1995), which purports to place the burden of conducting a due process analysis on the "trial court."[1] Nevertheless, in *Osakalumi* we analyzed the *Osakalumi*/*Talbert* factors ourselves and awarded the defendant a new trial based on our analysis. *Id.* at 767-68, 461 S.E.2d at 513-14. Although I agree that, *where circumstances permit*, the trier of fact is best suited to analyze and apply the *Osakalumi*/*Talbert* factors, the absence of an available finder of fact should not bar us from applying due process principles to the facts in the record or from "considering the other evidence that respondent was driving while under the influence of" controlled substances or drugs. *Talbert*, 245 W. Va. at 302, 858 S.E.2d at 927. In my view, a proper *Talbert* analysis shows that OAH properly affirmed the revocation of Ms. Yoder's licenses.

---

[1] *See Osakalumi*, 194 W. Va. at 759, 461 S.E.2d at 505, syl. pt. 2, in part (providing that "[i]n determining what consequences should flow from the State's breach of its duty to preserve evidence, a trial court should consider (1) the degree of negligence or bad faith involved; (2) the importance of the missing evidence considering the probative value and reliability of secondary or substitute evidence that remains available; and (3) the sufficiency of the other evidence produced at the trial to sustain the conviction").

*Talbert*'s first factor considers "the degree of negligence or bad faith involved in the violation of the statute [i.e., West Virginia Code § 17C-5-9.]" 245 W. Va. at 295, 858 S.E.2d at 920, syl. pt. 6, in part. As the majority decision points out, Officer Williamson did not appear for the hearing before OAH, and the DUI Information Sheet only indicates that a blood test did not occur. Similarly, Ms. Yoder's testimony before OAH merely establishes that she requested a blood test and that no blood test occurred.[2] Based on the record in this case, I find no "negligence or bad faith" to explain why Ms. Yoder did not receive a blood test. The record is simply blank on this issue, and I see no reason to think that remand to a trier of fact (if one were available) would yield further insight.

*Talbert's* second factor examines "the importance of the blood test evidence considering the probative value and reliability of secondary or substitute evidence that remains available[.]" *Id.* at 295, 858 S.E.2d at 920, syl. pt. 6, in part. In this case, Ms. Yoder arranged an eleven-panel urine screen on the day of her arrest, and the results of this screen were received into evidence before OAH. On remand from the circuit court, Ms. Yoder received further opportunity to offer expert testimony regarding the circumstances of the screen and its significance. According to her expert, the screen in question would yield a positive test for seven days after a person ingested any of the eleven substances. Though OAH ultimately concluded that Ms. Yoder was operating a motor vehicle under the influence of controlled substances or drugs, that was not because OAH found her evidence nonprobative or unreliable. Indeed, OAH found both of her experts "credible." What troubled OAH was the fact that an eleven-panel urine screen would not exclude other "drugs or substances that are often abused such as Gabapentin, [i]nhalants, or synthetic marijuana."

*Talbert*'s third factor looks to "the sufficiency of the other evidence produced at the proceeding to sustain the revocation." *Id.* at 295, 858 S.E.2d at 920, syl. pt. 6, in part. I believe that the evidence produced before OAH was sufficient to sustain the revocation of Ms. Yoder's driver's licenses. OAH found that Officer Williamson lawfully stopped Ms. Yoder "due to her

---

[2] Here are the relevant excerpts:

Q. Okay. Now, in this case, did Officer Williamson ever take you to the hospital for a blood draw or anything like that?

A. No, sir. And I asked him to.

. . . .

Q. Okay. Now, [does] that [i.e., having her "lungs broken"] account for failing the horizontal—or the eye test? Is that your testimony?

A. Actually, he had me there for about six or seven, eight, ten minutes. And he kept doing this, and I started laughing because it's like if you follow somebody's finger, I mean what are you supposed—? You know, I kept telling him I'm not drinking, go—please take me to get a drug test.

15

driving pattern" and that, during the stop, Officer Williamson observed "several signs" of impairment. OAH noted Officer Williamson's observations that Ms. Yoder "stumbled out of her vehicle" and approached his vehicle; that her speech was "slightly slurred"; that "her eyes were red"; that she was "disoriented" and "confused"; that she had "dry mouth[] and a raspy voice"; and that she "made strange statements." Additionally, according to OAH, "[s]everal impairment clues were detected on the field sobriety tests." Specifically, OAH found that

> [d]uring the horizontal gaze nystagmus test, . . . [Ms. Yoder]'s eyes showed a lack of smooth pursuit, distinct and sustained nystagmus at maximum deviation, and the onset of nystagmus prior to forty-five (45) degrees. During the walk-and-turn test, . . . [she] could not keep her balance and started too soon during the instruction phase. During the walking stage, . . . [she] stopped while walking, stepped off the line, made an improper turn, missed heel-to-toe, raised his [sic] arms to balance and took the incorrect number of steps. During the one-leg[-]stand test, . . . [she] used her arms for balance and put her foot down. . . . [Officer Williamson] stopped the one-leg[-]stand test for . . . [her] safety.

Despite hearing Ms. Yoder's live testimony, OAH found that Officer Williamson's account was "more credible and in line with common sense" and that Ms. Yoder's testimony "as to her driving pattern and the reasons she drove this way[] d[id] not make sense[.]" OAH noted, in particular, Officer Williamson's report that she "almost hit his patrol car" and "end[ed] up crossways in the middle of the road." OAH was also critical of Ms. Yoder's "decision to get out of her car and walk back to [the] patrol car"; OAH found that this indicated "impaired judgment." In the end, OAH found that there was "a lot" of evidence that Ms. Yoder was driving while impaired and that "more likely than not" she was "under the influence of a controlled substance[] or drug[] that the [eleven-]panel drug screen test does not test for." These findings are to be "accorded deference unless the reviewing court believes the findings to be clearly wrong." Syl. Pt. 1, in part, *Muscatell v. Cline*, 196 W. Va. 588, 474 S.E.2d 518 (1996). I do not believe that they are clearly wrong.

Accordingly, because I believe that our consideration of the *Talbert* factors in this matter is proper and that such consideration supports the revocation of Ms. Yoder's licenses, I respectfully dissent from that portion of the majority decision that affirms the circuit court's reinstatement of Ms. Yoder's licenses.[3]

---

[3] I would also note that West Virginia Code § 17C-5C-1a does not support the majority's decision in this matter. While subsection (c)(1) of this section required that in appeals "pending before the office on or after July 1, 2021, the underlying revocation or suspension order shall be dismissed[,]" OAH entered its final order on June 29, 2021. Therefore, Ms. Yoder's appeal was not "pending before the office on or after July 1, 2021," and such section did not require dismissal of the revocation order. W. Va. Code § 17C-5C-1a(c)(1).